

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JUDITH BURKENSTOCK                    CIVIL ACTION

VERSUS                                NO.  04-3348

NORTHWEST AIRLINES, INC.              SECTION "R" (4)

## ORDER AND REASONS

This is an action for review of the denial of long-term disability benefits by the administrator of an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1054, *et seq.* Before the Court is defendant's motion for summary judgment. For the following reasons, the Court DENIES defendant's motion for summary judgment.

## I.   BACKGROUND

Judith Burkenstock is a former employee of Northwest Airlines. Burkenstock began working for Northwest as a customer service agent on May 4, 1974. The last day she worked was July



26, 2002.

On November 5, 2001, Burkenstock injured her lower back while attempting, along with a co-worker, to carry a passenger in a chair off of an airplane.  She received treatment in the form of physical therapy, medication, a steroid injection, and eventually had surgery for this injury.  On April 19, 2003, Burkenstock applied for disability retirement benefits under the Northwest Airlines Pension Plan for Salaried Employees. Northwest Airlines is the administrator of the plan.  Northwest denied Burkenstock's claim on the basis that Burkenstock was not totally and permanently disabled in accordance with the terms of the plan.

Burkenstock sued Northwest for disability retirement benefits in this Court.  Currently before the court is Northwest's motion for summary judgment and request for an award of attorneys' fees.


II.  DISCUSSION

    A. Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56(c));
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court

2

must be satisfied that no reasonable trier of fact could find for

the nonmoving party. *Lavespere v. Niagara Mach. & Tool Works,*

*Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). The moving party bears

the burden of establishing that there are no genuine issues of

material fact.

If the dispositive issue is one on which the nonmoving party

will bear the burden of proof at trial, the moving party may

satisfy its burden by pointing out that the evidence in the

record contains insufficient proof concerning an essential

element of the nonmoving party's claim. *See Celotex*, 477 U.S. at

325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts

to the nonmoving party, who must, by submitting or referring to

evidence, set out specific facts showing that a genuine issue

exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not

rest upon the pleadings, but must identify specific facts that

establish a genuine issue exists for trial. *See Id.* at 325;

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

### B. ERISA Review

Under ERISA, a claims administrator must make two findings

to determine whether an employee is entitled to benefits under a

plan. *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th

Cir. 1998)(*citing Pierre v. Conn. Gen. Life Ins.*, 932 F.2d 1552,

1557 (5th Cir. 1991)). 1557). The administrator must first

determine the facts underlying the claim for benefits. *Id*. (citing *Pierre*, 932 F.2d at 1562). The administrator must then "determine whether those facts constitute a claim to be honored under the terms of the plan." *Id*. (emphasis in original). If the administrator denies benefits to the participant, section 1132 of ERISA provides that the employee may bring suit in federal district court "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

In cases arising under ERISA, whether the question before the Court is one of factfinding or policy interpretation is not always clear. Another court in this district has described the difference thusly: "A factual determination usually consists of an administrator's finding that a claimant's condition meets a definition in the policy. ... [A] challenge to plan interpretation usually consists of the plan administrator's interpretation of a plan term." *Chapman v. The Prudential Life Ins. Co. of America*, 267 F.Supp.2d 569, 576 (E.D. La. 2003).

In their briefs to the Court, both parties focused on the question of whether Northwest abused its discretion in its interpretation of the plan based on the language it used in

4

certain questions posed to Dr. Bradley Bartholomew.  Def.'s Mot.
for Summ. J. 8-14; P.'s Mot. in Opp. to Mot. for Summ. J. 3-9;
Def. Rep. in Supp. of its Mot. for Summ. J. 2-4.

Consequently, the Court will review Northwest's
interpretation of the plan term, the only disputed issue before
the Court.

(a) *Review: Plan Interpretation*

In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court
delineated the appropriate standard of review of an
administrator's interpretation of the terms of the plan and
whether the claim falls within those terms.  489 U.S. 101 (1989).
The Supreme Court held that "a denial of benefits challenged
under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard
unless the benefit plan gives the plan administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan."  *Id*. at 115; *see also*
*Schadler*, 147 F.3d at 394.  When a plan vests discretionary
authority in the administrator, "courts review the decision under
the more deferential abuse of discretion standard." *Schadler*, 147
F.3d at 394.  The Fifth Circuit has noted that although it "has
no desire to wade into the largely semantic" conflict that
surrounds an exact definition of the abuse of discretion

5

standard, "if a decision is supported by substantial evidence and is not erroneous as a matter of law, it is not arbitrary and capricious" or an abuse of discretion. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 n.12 (5th Cir. 1992).

Northwestern is a claims administrator with discretionary authority to interpret the Plan. Def.'s Mot. for Summ. J., Ex. 1 at NWT 042. (expressly stating that "The Employer shall have the sole discretion...to interpret and construe the Plan Statement"). The Court will accordingly review Northwestern's ultimate determination for abuse of discretion as required by *Schadler*.

The Court applies a two-step process to review a plan fiduciary's interpretation of its plan.

> First, the Court must determine the legally correct
> interpretation of the plan.  If the administrator did
> not give the plan the legally correct interpretation,
> the court must then determine whether the
> administrator's decision was an abuse of discretion.
> In answering the first question, i.e., whether the
> administrator's interpretation of the plan was legally
> correct, a court must consider:
> (1)  whether the administrator has given the plan a
> uniform construction,
> (2)  whether the interpretation is consistent with a
> fair reading of the plan, and
> (3)  any unanticipated costs resulting from different
> interpretations of the plan.

*Ellis v. Liberty Life Ins. Co. of Boston*, 394 F.3d 262, 269-70 (5th Cir. 2005)(quoting *Wildbur*, 974 F.2d at 637-38).

6

Because Northwest is both the plan sponsor and the plan administrator, the Court must take this conflict of interest into account in its analysis. *Ellis*, 394 F.3d at 270. Burkenstock has not presented evidence that this conflict influenced the administrator's determination. Accordingly, the court treats the existence of a conflict as a factor demanding only a modicum less deference to the administrator's determination. *Vega v. Nat'l Life Ins. Svcs., Inc.*, 188 F.3d 287, 301 (5th Cir. 1999).

For the following reasons, the Court finds that, Northwest gave the plan an interpretation that was legally incorrect. Further, Northwest abused its discretion in interpreting the term "Disability" in the plan.

   *(b) Burkenstock's Plan*

Burkenstock was enrolled in the Northwest Airlines Pension Plan for Contract Employees with 29 years of "Vesting Service," as of February 18, 2003. Def.'s Mot. for Summ. J., Ex. 2 at NWT 157. Section 3.3.1 of the plan, "Disability Retirement Pension: When Available," provides that any participant in the plan with at least ten years of vesting service who is terminated by reason of disability shall receive a disability retirement pension. Def.'s Mot. for Summ. J., Ex. 1 at NWT 025. Section 1.3.1 of the Plan defines "Disability" as **"total and permanent disability**

7

which renders the Participant incapable of any employment with the Employer." *Id*. at 011. Section 1.2.13 of the Plan defines "Employer" as "Northwest Airlines, Inc., a Minnesota corporation, any other corporation that adopts this plan pursuant to Section 9.4, and any successor of any of them which adopts the Plan." *Id*. at 013. Under the plan, Burkenstock was thus entitled to a disability retirement pension provided her termination was occasioned by total and permanent disability rendering her incapable of any employment with Northwest Airlines.

The plan provides for a "Claim and Review Procedure" in Section 7.3, which includes the right to a review of the initial claim determination. *Id*. at 042-43.

### (c) Burkenstock's Medical History

Ms. Burkenstock injured her lower back on November 5, 2001, when she attempted to carry a passenger off of a plane with assistance. Def.'s Mot. for Summ. J., Ex. 2 at NWT 087. Shortly after the incident, she saw Dr. William Johnson, an orthopedist, for this injury. *Id*. Dr. Johnson prescribed a course of physical therapy which she followed over the course of several months. *Id*. at 138. Burkenstock continued to experience pain in her lower back and leg, so she was sent for an MRI scan on March 13, 2002. *Id*. The MRI showed evidence of degenerative changes

8

of her lumbar spine, degenerative disc disease, a disc bulge, and degenerative change of the apophyseal facet. *Id.*

Burkenstock continued to receive physical therapy, but her pain did not subside, and in April of 2002 Dr. Johnson ordered an EMG, which showed evidence of mild irritation of her L5-S1 nerve root but no evidence of nerve dysfunction. *Id.* at 138-39. She continued to take medication and receive physical therapy. *Id.* During this time, she was able to return to full duty work for only one week and was otherwise confined to light duty. *Id.* at 087.

After the EMG, Burkenstock saw Dr. Robert Steiner, who prescribed a second course of physical therapy, which eventually was changed to a work conditioning program in September 2002. *Id.* at 139. Dr. Steiner also prescribed steroid injections. *Id.* at 087. There is a conflict in the record as to whether these injections provided Burkenstock with any pain relief. Compare *id.* at 139 with *id.* at 87. In December of 2002, Burkenstock again saw Dr. Steiner, who determined that she had reached maximum medical improvement and that she should be on permanent light duty status. *Id.* at 139. He also gave her a 5 percent permanent partial disability rating. *Id.* Dr. Steiner also noted that Burkenstock had remained active during her period of

9

treatment and had been playing golf throughout the preceding period. *Id.*

In May 2003, Burkenstock again saw Dr. Steiner for increasing pain; he referred her to physical therapy and treated her with lycorine (sic) for her breakthrough symptoms. *Id.*

In September of 2003, Burkenstock saw a neurologist, Dr. William Johnston, who recommended that she undergo a lumbar myelogram. *Id.* The myelogram showed disc herniation. *Id.* Dr. Johnston performed a left L4-5 diskectomy on April 1, 2004 (after Burkenstock filed for disability benefits), which did not succeed in eliminating her pain and may have worsened it somewhat. *Id.* at 87.

### (d) Burkenstock's Initial Claim

Northwest denied Burkenstock's application for benefits in a letter dated February 6, 2004. Def.'s Mot. for Summ. J., Ex. 2 at NWT 135-36. Northwest based its determination on a File Review performed by Dr. James Gannon. *Id.* at NWT 138-41. Apparently Dr. Gannon did not examine Burkenstock directly; he relied for his determination on her medical records. *Id.* at NWT 138. Apart from a summary of her medical history, Dr. Gannon responded to several "Interrogatories" provided to him by Northwest. Northwest's "Interrogatories" contained the following

10

questions:

1.  Was Mrs. Burkenstock totally disabled from any and all employment not limited to her current position with Northwest Airlines on February 2004?

2.  Was Ms. Burkenstock permanently disabled from any and all employment not limited to her current position with Northwest Airlines on February 2004?

3.  On what date was Ms. Burkenstock both totally and permanently disabled from all employment including light or sedentary work without regard to pay level?

4.  Is there any type of work that Ms. Burkenstock could do?

5.  Is there any treatment currently available that would allow Ms. Burkenstock to return to some kind of employment?

*Id.* at 140-41.  Dr. Gannon stated that he did not believe Burkenstock was ever totally or permanently disabled and that he believed she had always been capable of "light duty" work.  He noted that she should avoid jobs that require heavy lifting, bending, or stooping on a regular basis, but that she was capable of light duty work at the time of the examination.  *Id.*

On the basis of Dr. Gannon's report, Northwest "determined that [Burkenstock] did not satisfy the definition of Disability on December 19, 2003, the last day [Burkenstock was] on the Northwest payroll."  *Id.* at 135.  The denial letter from

11

Northwest advised Burkenstock of her right to appeal the
decision, which would require her to undergo an independent
medical examination (IME).  *Id.* at 135-36.  The letter stated:

> The independent medical examiner will perform a physical
> examination, review your claim, and make a determination of
> whether, due to your medical condition, you satisfied the
> definition of Disability under the terms of the Plan on
> December 19, 2003.  The independent medical examiner's
> decision will be final and binding on both you and
> Northwest.

*Id.* at 136.

> ### (e) Burkenstock's Appeal

Burkenstock chose to avail herself of the appeal process and
selected Dr. Bradley Bartholomew from a list of three potential
independent medical examiners.  *Id.* at 127.  On July 27, 2004,
Dr. Bartholomew examined Burkenstock.  *Id.* at 103.  His report
describes her medical history, details her condition at the time
of the examination, and gives his observations of the tests
performed by her treating physicians.  *Id.* at 087-88.  Dr.
Bartholomew then recounts the substance of his discussion with
Burkenstock regarding her occupational limitations.

> As far as her work status, I do not believe she can
> return to her previous job, as I believe, with the
> previous back surgery and underlying symptoms, she
> should not do any repetitive bending, stooping,
> crawling, twisting, or picking up more than 25 pounds
> on a repetitive basis.  I think even with sedentary
> duty, she would have to be able to alternate positions

between standing, sitting, and lying down on an hourly
basis.  She discussed the possibility with me that she
may have a job in Minneapolis, but it would require
commuting.  I do not believe that long trips on
airplanes in small seats with decreased ability to get
up and move around would be acceptable for her pain-
wise.

*Id.* at 088.  Dr. Bartholomew also responded to seven "Specific

Interrogatives," the first five of which were similar to the

"Interrogatories" posed to Dr. Gannon:

SPECIFIC INTERROGATIVES:

1.    Was Ms. Burkenstock totally disabled from any and
      all employment, not limited to her current
      position with Northwest Airlines on 12/19/03?

      **no**

2.    Was Ms. Burkenstock permanently disabled from any
      and all employment, not limited to her current
      position with Northwest Airlines on 12/19/03?

      **no**

3.    On what date was Ms. Burkenstock both totally and
      permanently disabled from all employment
      (including light or sedentary work without regard
      to level of pay)? n/a
      If Ms. Burkenstock was not both totally and
      permanently disabled from all employment, please
      explain your reasons for your opinion.

      **Please refer to the body of my report.**

4.    Is there any type of work that Ms. Burkenstock
      could do?
      If yes, please describe.

      **yes        Please refer to the body of my report.**

5.  Is there any treatment currently available that would allow Ms. Burkenstock to return to some kind of employment?  If yes, please describe the type of treatment, and the frequency and duration of care you believe is indicated.

**yes**      **Patient may be a candidate for surgery, but it would not change her disability / restrictions.**

6.  Describe the activities that ms. burkenstock [sic] reports engaging in since the onset of disability

**minimal**

7.  Do you believe the activities described in item 6 above are typically engaged in by a person with this type of disability?

**yes**

*Id.* at 088-89 (emphasis, bolding, and formatting in original).

On September 30, 2004, Northwest advised Burkenstock that Dr. Bartholomew determined that she was not totally and permanently disabled according to the terms of the Plan.  Accordingly, it denied her claim.  *Id.* at 086.

*(f) Analysis*

1. Was Northwest's interpretation legally correct?

The record contains very little evidence as to what Dr. Bartholomew knew about the plan.  Northwest relies on a letter dated October 29, 2004, in which a Northwest employee asserts that "Dr. Bartholomew was provided with the definition of

14

Disability in the Plan." Def.'s Mot. for Summ. J., Ex. 2 at NWT
077. But asserting that Dr. Bartholomew received the correct
definition and proving that it is an undisputed material fact are
two different things. The only additional evidence in the
administrative record is what appears to be an email attachment
sent from Eydie Cusack of Northwest to Lauri Jedlicki of
America's IME, the company which acted as an "impartial third
party" in providing a list of physicians from which Burkenstock
could select the individual to perform her IME. Def.'s Mot. for
Summ. J., Ex. 2 at NWT 129-33. While this attachment does
include the definition of Disability under the plan, as well as
questions correctly phrased to correspond with this definition,
there is no evidence in the administrative record that Jedlicki
sent these materials to Dr. Bartholomew. Indeed, the definition
of Disability in the plan does not appear in Dr. Bartholomew's
report.

Furthermore, the administrative record contains evidence
that Dr. Bartholomew was asked questions that reflect an
incorrect understanding of disability under the plan. The plan
defined Disability to mean "total and permanent disability which
renders the Participant incapable of *any employment with the
Employer*." Def.'s Mot. for Summ. J., Ex. 2 at NWT 011 (emphasis

15

added).  Dr. Bartholomew was asked, in part:

1.     Was Ms. Burkenstock totally disabled from any and all employment, not limited to her current position with Northwest Airlines on 12/19/03?

2.     Was Ms. Burkenstock permanently disabled from any and all employment, not limited to her current position with Northwest Airlines on 12/19/03?

3.     On what date was Ms. Burkenstock both totally and permanently disabled from all employment (including light or sedentary work without regard to level of pay)?

     If Ms. Burkenstock was not both totally and permanently disabled from all employment, please explain your reasons for your opinion.

Def.'s Mot. for Summ. J., Ex. 2 at NWT 086.

The meaning of the plan is clear: the applicant had to be incapable of any employment with Northwest.  The questions posed to Dr. Bartholomew had a very different meaning; they asked, in effect, whether the applicant was incapable of working anywhere. It is plain that the comma in the first two questions broadens the world of employment beyond Northwest Airlines to "any and all employment."  The third question does not refer to Northwest at all.

This distinction is important, since other employers, but not Northwest, may have jobs that someone with Burkenstock's disability could perform.  There is no evidence in the record indicating that Dr. Bartholomew was aware of the range of jobs available at Northwest or the physical demands they might

16

require.  Indeed, it is apparent that Dr. Bartholomew did not
construe the inquiry as centered on employment with Northwest
because he states in his report that Burkenstock came to "discuss
what type of job she could do, if any."  Def.'s Mot. for Summ.
J., Ex. 2 at NWT 088.

Applying the test for whether a plan administrator has given
a legally incorrect interpretation to a plan term, the Court
first notes that there is no evidence as to how Northwest
interpreted the plan term in other cases.  Next, no unanticipated
costs could result from Burkenstock's preferred interpretation,
since she asks only that the term be interpreted as it is
written.  The only remaining question is whether Northwest's
interpretation is consistent with a fair reading of the plan.

As described above, the interpretation of "Disability" used
in Northwest's interrogatories to Dr. Bartholomew cannot be
squared with the clear meaning of the term in the plan.
Therefore, the court finds that Northwest's interpretation of the
term "Disability" was not legally correct.

2. Did Northwest abuse its discretion?

The next question for the court is whether Northwest's
interpretation constituted an abuse of discretion.  Here, the
Court considers three factors: (1) the internal consistency of

the plan under Northwest's interpretation; (2) any appropriate
regulations; and (3) the factual background of the determination
and any inferences of a lack of good faith. *Ellis*, 394 F.3d at
272, n.23 (citing *Wildbur*, 974 F.2d at 638). When, as here, an
administrator's interpretation of a plan is in direct conflict
with express language in a plan, this action is a very strong
indication of arbitrary and capricious behavior. *Wildbur*, 974
F.2d at 638.

    The parties have submitted no argument or evidence on the
first two factors in the test for an abuse of discretion. As to
the issue of bad faith, there is some evidence of a lack of good
faith. The Court refers to Northwest's outright refusal to ask
Dr. Bartholomew the correctly worded question immediately upon
becoming aware of the error made in the "interrogatives." The
record shows that Northwest was not reluctant to return Dr.
Bartholomew's report to him when Northwest was not satisfied with
it. Def.'s Mot. for Summ. J., Ex. 2 at NWT 090. But when Ms.
Burkenstock's attorney pointed out to Northwest that the
"interrogatives" did not use the same wording as the plan,
Northwest refused to send the correct questions to Dr.
Bartholomew when it could have easily done so. Instead,
Northwest asserted that the "interrogatives" were "based on" the

correct plan definition and "still accurately reflect the requirements of the Plan." *Id.* at 077.

As noted above, reading Dr. Bartholomew's report suggests that he did not understand his inquiry to be restricted to whether Burkenstock was capable of any work with Northwest. As he understood the question, Burkenstock came to "discuss what type of job she could do, if any." *Id.* at 088. Nowhere in his report is there any indication that he and Burkenstock discussed the physical demands of jobs at Northwest apart from her previous job, to which he felt she could not return. *Id.*

Because Northwest's interpretation was made under factual circumstances that the Court finds suggestive of a lack of good faith, the Court cannot find that Northwest is entitled to summary judgment that it properly exercised its discretion in construing the plan. Accordingly, defendant's motion for summary judgment is DENIED.

### III. COSTS AND FEES

Northwest requests costs and fees under ERISA. Because this court has denied Northwest's motion for summary judgment, it will not award costs or fees to Northwest.

**IV.   CONCLUSION**

For the foregoing reasons, the Court DENIES defendant's motion for summary judgment and DENIES defendant's request for an award of attorneys' fees.

New Orleans, Louisiana, this 31st day of October 2005.

*Sarah Vance*

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE